### THE KERRY RANGE.

### THE ANTHONY GROVES, JR.

#### (District Court, D. Maryland.   May 20, 1918.)

COLLISION ☞71(2)—MOVING AND BURNING VESSEL—FAULT.

    A collision in Baltimore harbor at night between a moving steamship and one on fire, held by salving tugs fighting the fire as far from the burning piers as she could be drawn because of her anchor, which the fire had caused to drop, *held* on the evidence due solely to the fault of the moving vessel.

In Admiralty. Suits for salvage against the British steamship Kerry Range by the Curtis Bay Towing Company, owner of the tugs Dandy and others, by the Merchants' & Miners' Transportation Company, owner of the tug Isis, and by the Baker Whiteley Coal Company, owner of the tugs Britannia, Chicago, and Elma, heard with suit for collision by Furness, Withy & Co., Limited, owner of the

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Kerry Range, the Salvage Association, London, and the Inter-Ocean Transportation Company, Limited, against the steamship Anthony Groves, Jr. Decrees for libelants.

George Weems Williams and L. Vernon Miller, both of Baltimore, Md., for Curtis Bay Towing Co.

Thaddeus H. Swank, of Baltimore, Md., for Merchants' & Miners' Transp. Co.

Harry N. Abercrombie, of Baltimore, Md., for Baker Whiteley Coal Co.

Whitelock Deming & Kemp and John B. Deming, all of Baltimore, Md., for the Kerry Range, Furness, Withy & Co., Limited, Salvage Ass'n, London, and Inter-Ocean Transp. Co., Limited.

George Forbes and Willis R. Jones, both of Baltimore, Md., for the Anthony Groves, Jr.

ROSE, District Judge. At about 20 minutes before 11 on the night of October 30th last fire was discovered on the Baltimore & Ohio Railroad Company's Pier No. 9, on the Locust Point side of the Baltimore Harbor. It speedily involved Pier No. 8 and the British steamship Kerry Range, which at the time of its outbreak was made fast to the east side of Pier 9, bow in. A number of tugs tried to get her out of her dangerous position and to extinguish the flames aboard her. While still engaged in their salving operations, the steamship Anthony Groves, Jr., came into collision with the Kerry Range. In these cases, the salvors seek compensation from the steamship Kerry Range, and the latter asks damages from the Groves.

The fire, in its first stages, spread with such rapidity that it was with difficulty that any of those on the steamship escaped with their lives, and a number of them perished. Her master, before he was forced from her decks, managed to have her lines, or most of them, cast off. Unfortunately the anchor chock burned, and the anchor dropped to the bottom. The steamship was about to sail, and she had on board shells and ammunition for her armament against submarines. So soon as the fire reached her stern, in which her magazine was, exploding shells made approach to her dangerous. From time to time different tugs contrived to get a line upon her. Three of them, pulling in tandem fashion, tried unavailingly to force her to drag her anchor. All they succeeded in doing was to pull her out into the stream so far as her 135 fathoms of chain would let her go. There they held her, with her bow about 200 or 250 feet away from the burning piers, until morning came, and with it men and an acetylene flame to cut her chain. They then towed her over to the flats, where by cutting holes in her sides, and having the powerful city fireboats pump water into her, she was scuttled in shallow water. It was not until a day or two later that the fire aboard her was finally put out. The salving tugs, or some of them, continued pumping on her from the time they first got her out into the stream until the fire on her was finally extinguished.

It is not possible to say how much the tugs saved to the owners of ship and cargo. When they left her, she was a wreck, but a wreck

which, in these times, at least, was not without money's worth. The value of the cargo, which was not destroyed, or even much injured, ran into large figures; but then most of it was proof against both fire and water. Weighing everything in evidence, it seems probable that the tugs were of not a little use. Moreover, what they did, or the larger part of it, was done under the eyes and with the approval of the master of the ship. He seems a competent and sensible man. In the end, a salvage award of $17,500 was made, reduced, however, by the sum of $250, the cost to the ship of the unnecessarily large stipulation which the salvors demanded. The net award is therefore $17,250. This sum was apportioned among tugs of a total value of nearly $450,000, in proportion to services rendered by them, respectively; due allowance being made for danger, difficulty, time, and success. This apportionment was much facilitated by the fact that, while there were seven tugs, there were only three owners. Of the total salvage decreed, a sum slightly less than one-fourth was allotted to the masters and men of the tugs. The owners, however, assumed to pay out of their share all fees to proctors and advocates, so that the men will receive in fact slightly more than one-fourth of all the money actually reaching the libelants. No one on any of the tugs will receive less than one-half a month's wages; none of them more than one and a half months'. The master in each case will be paid an extra allowance, ranging from $25 to $100. Fifty dollars will be added to the share of each of the men who took whatever personal risk there was in making the line fast to the rudder post of the burning ship. The aggregate award was more than the ship thought she ought to pay, but less than the tugs were persuaded they should get. I understand, however, that no one of them wishes to carry this part of the controversy further. It follows that no good purpose will be served by a more detailed statement of the reasons which led to the fixing of the salvage at the figures named.

## The Collision.

The Anthony Groves, Jr., runs over the inside route between Philadelphia and Baltimore, passing through the Chesapeake & Delaware Canal. On the morning after the fire, while on its regular trip to Baltimore, it ran into the Kerry Range, and damaged it to the ascertained extent of $7,908. At that time, for some hours before, and for two hours afterwards, the Kerry Range was lying in the main ship channel, and at right angles to its course. The tugs Britannia and Curtis Bay were holding the ship in position. For this purpose, the former had a line from its stern to the rudder post of the ship, and the Curtis Bay was lashed to the port side of its companion. The ship, the hawser, and the tugs must have occupied a space of not less than 600 feet, and perhaps a little more, directly across the fairway. There was, however, a sufficient depth of water on either side for any vessel, inbound that morning, safely to pass, either to the westward, between the ship's stem and the pier, or to the eastward, across the bows of the tugs. A half dozen or more steamers did so; some going to the east, some to the west. The Groves, on the other hand, came head on

squarely into the Kerry Range, striking it on its port side, a little aft of midships. The master of the Groves was then in its wheelhouse, directing its navigation. After seeing him on the stand, and hearing his testimony, there is no question that he was greatly in fault. It is true that, while the night had been clear and dawn was breaking, sunrise was still three-quarters of an hour off. There were, of course, no lights on the Kerry Range. She gave no signals, because from the time her crew fled for their lives until after the collision nobody was on her, and nobody could get on her. There was much smoke, and a good deal of it came from the ship itself. The wind was light, but its direction was such that the smoke cloud interposed between the helpless ship and upbound craft. Nevertheless, the master of. the Groves says distinctly that the smoke was not coming from the shore, but from the river. He must have known it could not have been rising out of the water, and yet he says he did not stop his engines until he got within 100 feet of the smoke bank, and did not reverse until he was within 4 or 5 feet of the Kerry Range. He claims it was not until then he saw the ship.

In a number of particulars, it is impossible to reconcile his testimony with itself. It would be useless labor further to analyze what he says. Some of the others who testified for the Groves were better witnesses, but the net effect of their testimony leaves unshaken the conclusion which must be drawn from that of the master. On her behalf, it is, however, urged that others were to blame. The Kerry Range at least must be held guiltless. She had been for. hours an inert log. Her master had, not long after his escape from her, hired a small tug and had thereafter cruised around in her vicinity. He occasionally made suggestions to the salving tugs. They seem to have been uniformly sensible, but he was in no sense in control of the salvors. At the time of the collision, he was not on the scene at all. He had gone off to do the best possible thing—namely, to get men and appliances with which to cut the anchor chain; so that his ship could be moved.

It is said that it was wrong to place the Kerry Range across the channel. What else could have been done to her? As she was held fast by her anchor, the tugs were not able to get her more than 250 feet at the extreme estimate, outside the piers. The only possible choice of position for her lay within that distance of the pier heads. It is urged that she should have been put parallel to the channel course, and not across it; but to have done so would have brought her close to the piers, when everybody wanted to get her away from those burning structures. Moreover, in any such position as is suggested, the ship would have greatly hampered the movements of the city fireboats and their helping tugs in their efforts to get water on the piers. The chief of the city fire department told the tugs to pull the ship as far out as they could. In short, there were many experienced men on the ground. They represented quite diverse interests. It never occurred to any of them that what was then done was not the best, and indeed the only, thing to do. They were clearly right.

It is strongly urged that as the ship, lying directly across the fairway, was without lights, unable to signal, and hidden by the smoke, the

tugs, which had placed her there and there held her, were bound to do something to warn upbound vessels of her presence. What would that something have been? The smoke cloud did not keep the Britannia from seeing approaching craft, nor apparently did it hide its lights from them. It sounded danger signals whenever the movements of an inbound boat suggested that it was coming close to the Kerry Range, without being aware of the latter's presence. Such signals were admittedly given to the Groves. The dispute is as to when they were sounded. According to the testimony from the Britannia, they were given in ample time. The men from the Groves say they did not hear them until too late to avoid the collision. It is quite likely that one side exaggerates and the other minimizes the time which elapsed between the giving of the first of these signals and the collision. There can be little question, however, that they were sounded in ample time to have prevented any possibility of the ships coming together, had the Groves approached the ominous smoke bank with the caution prudence dictated. Unusual care is required of her, if any credence can be given to the testimony of her master as to the distance she moves after her engines have been stopped, and even after they have been reversed.

It is said that a tug should have been sent down the river to warn ships of the position and helpless condition of the Kerry Range. Such a precaution would have prevented the collision, had those on the tug been able to have attracted the attention of any one on the Groves; but is the failure to take it a legal fault, and, if so, whose? No positive rule or regulation imposes such a duty on any one. The tugs were in one sense co-operating; but, after all, they were legally each acting for itself. Which one of them was to blame for not leaving the burning ship and going down the river to give warning? In short, the Groves' fault is palpable. It caused the accident. It must bear all the consequences, unless it is able to fix definite liability on some one or more of the other vessels. This it has not done. The facts sharply distinguish the instant case from that of The Bremen and The Main (D. C.) 111 Fed. 228. There salvors unnecessarily beached a burning ship with red-hot plates close to another vessel, which was thereby greatly damaged. Everybody who had a part in this careless act was properly held liable for its consequence. In this case no one of the salvors did anything which it should not have done.

The Groves cannot shift its liability to any of the tugs, because they did not do something which no law or rule required, and which it did not occur to anybody to do. The Groves must be held solely responsible.